UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

MINERGY NEENAH LLC,

        Plaintiff,

v.                                                Case No. 05-C-1181

ROTARY DRYER PARTS, INC., et al.,

        Defendants.

**DECISION AND ORDER**

Before me presently is the summary judgment motion of defendant Burlington Insurance Company. Burlington asserts that the applicable insurance policy does not cover the damages alleged in this case and that its duty to defend is therefore at an end. For the reasons given herein, the motion will be denied.

**I. Background**

Plaintiff Minergy operates large industrial dryers, which it uses to dry coal sludge for use as fuel. The dryer at issue in this case is 12 feet in diameter and 85 feet long; it works by heating more than 200 tubes with steam and then feeding the wet sludge into the dryer. When the sludge comes in contact with the heated tube surfaces, the water in the sludge evaporates, which allows the end result, now dried, to be used as fuel. (Compl. ¶ 9.)

Minergy decided to refurbish one of its dryers and hired the Charles Brown Company ("CBC"), a predecessor to defendant Rotary Dryer Parts, Inc., to replace the dryer's steam tubes. On October 7, 2004, while CBC and a subcontractor were working on the tubes, a fire broke out in the sludge and caused substantial damage to the interior of the dryer and rendered it unusable for

roughly a month. The fire also caused structural damage to the dryer shell (the exterior) and damaged auxiliary equipment. Efforts to repair the dryer failed and Minergy had to remove and replace an entire section of the dryer. In the present lawsuit, Minergy alleges over $600,000 in damages it incurred in repairing the dryer and other damage, as well as economic losses it sustained as a result of the dryer being out of service for a month. It also seeks legal fees, although it does not claim such fees are covered by Burlington's policy.

**II. Analysis**

Burlington issued a standard CGL policy to Rotary's predecessor company, which covers property damage resulting from an "occurrence." Burlington asserts that the act at issue here (the fire) was not an "occurrence" under the policy; it also claims that the policy's business risk exclusion, (j)(5), excludes coverage. The parties agree that Illinois law applies; like Wisconsin, Illinois requires an insurer to defend a claim if coverage could potentially exist under the applicable policy language. As the Illinois Supreme Court has summarized the analysis:

> An insurer's duty to defend its insured is much broader than its duty to indemnify its insured. An insurer may not justifiably refuse to defend an action against its insured unless it is clear from the face of the underlying complaint that the allegations set forth in that complaint fail to state facts that bring the case within or potentially within the insured's policy coverage. A court must compare the allegations in the underlying complaint to the policy language in order to determine whether the insurer's duty to defend has arisen. If the underlying complaint alleges facts within or potentially within policy coverage, an insurer is obligated to defend its insured even if the allegations are groundless, false or fraudulent. The allegations in the underlying complaint must be liberally construed in favor of the insured.

*General Agents Ins. Co. of America, Inc. v. Midwest Sporting Goods Co.,* 828 N.E.2d 1092, 1098 (Ill. 2005) (citations omitted). With these considerations in mind, I will proceed to address Burlington's arguments against coverage.

2

**1. Occurrence**

The standard CGL policy provides coverage for property damage only if it is caused by an "occurrence," which the policy defines as an accident. (PFOF ¶ 17-18.) Courts define accident as "an unforeseen occurrence, usually of an untoward or disastrous character or an undesigned sudden or unexpected event of an inflictive or unfortunate character." *Viking Const. Management, Inc. v. Liberty Mut. Ins. Co.,* 831 N.E.2d 1, 6 (Ill. App. Ct. 2005). Certainly, an unexpected fire would seem to meet the definition of an accident. But Burlington argues that under Illinois law claims arising from a contractor's defective workmanship cannot constitute an occurrence. For this principle Burlington relies on *Viking Const. Management,* which noted that "CGL policies "do not 'cover "an occurrence of alleged negligent manufacture.'" 831 N.E.2d 1, 12 (Ill. App. Ct. 2005) (citations omitted). The reason for this is two-fold. First, defective workmanship does not readily fit within what we would normally call an accident: "property damage to a building caused by a contractor's defective construction of the building is not an accident and does not, therefore, constitute an occurrence." *Id.* at 11 (quoting *Monticello Ins. Co. v. Wil-Freds Construction,* 661 N.E.2d 451 (Ill. App. Ct. 1996)). Second, it is well established that, as a policy matter, CGL coverage does not extend to what are essentially warranty claims for the insured's own faulty work. Instead, the quality of the insured's work is a fundamental "business risk" assumed by the insured itself: "[t]he so-called 'business risk' refers to the expenses of repair or replacement incurred by the contractor in the event his work does not live up to its warranties. . . . The other risk refers to injury to people and damage to property caused by the contractor's faulty workmanship." *Bulen v. West Bend Mut. Ins. Co.,* 371 N.W.2d 392, 393 (1985).

3

Thus, it is clear that the contractor's own work is not covered, and in fact Minergy concedes that point. Instead, it seeks coverage for the damages the fire caused to parts of the dryer *other than* what the defendant was working on (i.e., the steam tubes), as well as economic losses stemming from the dryer's downtime. As the *Viking* court noted, "[i]n a case like this one, negligent manufacture may result in an occurrence when the result is damage to something other than the structure worked on." *Id.* As an example, it cited the case in which a contractor's faulty work caused damage to property *other than* the project on which he was working:

> If, for example, [plaintiff] had sued [defendant] for the water damage suffered by cars in the parking garage, or a pedestrian sued [defendant] for an injury caused by falling concrete, there can be little doubt that Monticello would be required to defend [defendant] under the CGL policy, because there would have been 'negligent manufacture that results in "an occurrence." ' On the other hand, where the only claim is one for a breach of contract alleging property damage to the project itself, we are faced merely with ' "an occurrence of alleged negligent manufacture."

*Id.* (citing *Wil-Freds Construction,* 661 N.E.2d 451).

Burlington argues that the defendant's negligence in starting the fire was not an "accident." Relying on *Viking Construction,* Burlington suggests that events which are the "natural and ordinary" consequences of defective workmanship are not "occurrences" under the policy. 831 N.E.2d at 15-16. In *Viking* the court found no occurrence because the "collapse of the wall and section of the building was the ordinary and natural consequence of improper bracing, i.e., faulty construction work, which resulted from, at least in part, Viking's breach of its contractual duties to ensure proper construction methods were employed." *Id.* at 16. Here, however, starting a fire was not the natural consequence of repairing a steam tube. That is, the damage was not caused by any faulty workmanship the defendant performed on the steam tubes, it was caused by – for lack of a better word – an "accident" that occurred while it was working inside the dryer. Whereas a

4

collapsed wall may be the obvious result of shoddy craftsmanship, there is no indication in the complaint that a fire was somehow a natural consequence of faulty replacement of steam tubes. Put another way, the plaintiff is not seeking coverage for faulty workmanship – the replacement of the steam tubes – but from an accident that arose while the work was being done. Under a liberal construction of the complaint, the fire alleged therein could easily constitute an accident and, therefore, an occurrence.

**2. Exclusion j(6)**

Burlington also argues that its j(6) exclusion applies. Exclusion j(6) excludes coverage for "property damage" to "that particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it." (PFOF ¶ 21.) This exclusion embodies more explicitly the "business risk" principles discussed above. In effect, the CGL policy excludes coverage for damage sustained by any part of an insured's work due to his own "incorrect" work.

Burlington asserts that because the defendant incorrectly performed work on the dryer, any damage to the dryer must be excluded. In other words, it asserts that the only property damage at issue here was damage to the dryer, and it views the dryer as a single unit of "property" upon which the defendant's "work" was incorrectly performed. This interpretation, however, neither fits the plain language of the exclusion nor the business risk purposes the exclusion embodies. First, the exclusion applies only to "that particular part" of the property upon which the insured was working, and this court recently interpreted this clause more narrowly than Burlington prefers. In *Durbrow v. Mike Check Builders, Inc.,* the plaintiff alleged property damage not just to the part of the house on which the insured contractor had worked, but also for water damage resulting from the insured's work. 2006 WL 1966966 (E. D. Wis. July 11, 2006). In rejecting the insurer's claim that the entire

5

house was the "property" subject to the exclusion, I concluded that "[b]y its plain terms . . . the exclusion does not apply when the damage at issue is not to that 'particular part' of the property on which the insured incorrectly performed work. Because the plaintiffs allege that some of the damage here was sustained on work not performed by Check Builders, the exclusion does not wipe out all coverage." *Id.* at *5. In other words, the exclusion did not apply to the entire house as if it were the "property" at issue; instead, only the "particular part" of that property on which the insured worked (siding and vapor barriers) would have been excluded from coverage.

Similarly, here the insured was only working on the steam tubes within the interior of a very large industrial apparatus. It was hired to replace steam tubes, and does not now seek coverage for any damage to its own work. Instead, the coverage claim is limited to the damage to other parts of the dryer that resulted from a fire that was allegedly caused by the insured's work. The fact that damage may have been caused to parts of a large integrated unit is merely happenstance; other sections of the dryer were simply not the "particular part" of the property at issue, and so by its own terms the exclusion does not apply.

Moreover, the intent of the exclusion also underscores its inapplicability. The claim is not brought for repairs or replacement of the contractor's faulty work, but rather for the damages, resulting from an accident, caused to other aspects of the project. Such damages are not within the scope of the business risks Burlington excluded: it is not placed in the position of paying a warranty claim or being asked to cover any damage to the insured's own work. Accordingly, I conclude that both the language of the exclusion as well as its purpose demonstrate that it is inapplicable to the coverage questions posed here.

6

*Willett*, a case upon which Burlington relies, is not to the contrary. The allegations in that case are as follows:

> Willett entered into a contract with Simmons to service, paint, clean, and prepare for summer use the in-ground swimming pool at Simmons's home. The agreement provided that Willett was to empty the pool, paint it, and fill it with water and the requisite chemicals so that it was ready for use. After Willett painted the pool and before he filled the pool with water, a heavy rainstorm caused the pool to push up out of the ground.

*Pekin Ins. Co. v. Willett,* 704 N.E.2d 923, 924 (Ill. Ct. App. 1998). The court concluded that exclusion j(6) applied because Willett's faulty work caused damage to the pool itself: "In essence, the underlying complaint alleged that the swimming pool needed to be replaced or repaired because Willett performed his work incorrectly by failing to fill the pool in a timely manner." *Id.* at 926. The court also found that "the exclusions do not exclude coverage for damage done only to the precise area of the property being worked on. Rather, the exclusions apply to property damage caused by poor workmanship." *Id.* It is true that the *Willett* court viewed the entire swimming pool as a cohesive whole, but the case is distinguishable because Willett's job was to service and prepare the *entire* pool – not just a portion of it. In contrast, our defendant was tasked only with replacing the steam tubes within a large industrial dryer. The distinction is more than academic because the scope of an insured's work dictates the business risk he (and his insurer) assumes. That is, it makes sense to hold Willett, rather than his insurer, accountable for damage to the entire pool when it was precisely his job to service the entire pool. In contrast, when one's task is quite limited (as the complaint in this case suggests), it no longer follows that one should be liable for damage outside of one's sphere of control. This principle is reflected in the "particular part" clause of the exclusion. Willett's "particular part" of the property was the entire pool itself, because that was the job he took

7

on. Here, the particular part the defendant worked on were the steam tubes within the dryer rather than the dryer as a whole. Accordingly, I do not find *Willett* controlling Illinois law on the applicability of the exclusion in this case.

For the same reasons, I reject Burlington's argument that such a reading of the exclusion would leave us with an unworkable and unrealistic standard. It suggests that if coverage is found in this case then every insured will be able to secure coverage merely by claiming they were only working on one specific part of a project rather than the surrounding areas that were damaged. This would result, Burlington posits, in an overly fractious and atomistic view of construction projects and would needlessly complicate coverage questions. I first note that the drafters of the standard CGL policy must have been expertly attuned to the nuances of the language they chose, and the CGL policy only excludes damages to "that *particular* part of any property." By its plain terms, the exclusion's language makes the same distinction I am making in this case. Thus, if the outcome is problematic to Burlington, it results more from drafting than interpretation. Yet it is doubtful that the outlook is as grim as Burlington fears. As noted above, the exclusionary language can nimbly flex to encompass exactly what the business risk entails in a given case. The contractor who is hired to service an entire pool will likely be on the hook for any damage his work causes to any part of the pool: the "particular part" of the property excluded will be the whole pool. In contrast, the "particular part" of the pool might be narrower for a contractor hired only to service the pool's heater.

This distinction is made clear by another case Burlington relies upon, *Vinsant Electrical Contractors v. Aetna Cas. & Surety Co.,* 530 S.W.2d 76, 78 (Tenn. 1975). There, an electrical contractor was hired to work on an electrical switchboard, but while working on one part of it he

8

dropped a wrench onto another part of it, which caused the switchboard to explode. The court concluded that an electrical switchboard was an entire unit and that damage to one part of it did not take the case outside of the exclusion even though the damage was outside of the contractor's immediate sphere of work. This result sensibly elevates substance over form; to hold otherwise would allow coverage whenever any of the "many interrelated and interdependent parts" within the switchboard was damaged by the very contractor who was hired to work on the switchboard, merely because the contractor might have damaged a red wire while working on a blue one. *Id.* at 76-77. *Vinsant* would be more persuasive here if the insured were claiming coverage for damage caused to one part of a steam tube while the insured was working on another part of it, or for damage caused to one steam tube while he was working on another. Presumably there are other examples involving damage more closely related to the scope of the insured's work. But here the plaintiff eschews this approach and does not seek coverage for the damage to the steam tubes within the dryer at all. In sum, any similarity between an electrical switchboard and a 12 foot-diameter industrial dryer is limited.

Moreover, Burlington's argument ignores that at this stage of the proceedings the allegations of the complaint are to be read liberally, i.e., in favor of coverage. "An insurer may not refuse to defend an action against its insured unless it is clear from the face of the underlying complaint that the allegations fail to state facts which bring the case potentially within the policy's coverage." *State Farm Fire and Cas. Co. v. Tillerson,* 777 N.E.2d 986, 989 (Ill. Ct. App. 2002). To conclude that the damages alleged here are all part of one integrated "part" of property, I would have to read the complaint's allegations narrowly and the policy's exclusion broadly–precisely the opposite of what Illinois law requires.

9

Accordingly, I find that the complaint alleges an occurrence and that the business risk exclusion does not apply.  The motion for summary judgment is denied, and Burlington therefore has a continuing obligation to provide a defense in this action.  The motion for leave to file a sur-reply is granted.

**SO ORDERED** this ___20th___ day of September, 2006.

                                          s/ William C. Griesbach
                                          William C. Griesbach
                                          United States District Judge