UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

MINERGY NEENAH, LLC,

        Plaintiff,

v.                                                                    Case No. 05-C-1181

ROTARY DRYER PARTS, INC., et al.,

        Defendants.

## DECISION AND ORDER

Plaintiff Minergy Corp. sued defendants Quality Mechanical, Inc. ("QMI") and Rotary Dryer Parts, Inc. ("RDP") after a fire started while QMI's employees were working inside one of Minergy's rotary dryers. These defendants, and their insurers, have moved for summary judgment on the basis that Minergy has failed to name an expert witness, which the defendants believe is crucial to Minergy's ability to prove its case. In addition, defendant Burlington Insurance Co. has moved for summary judgment on the grounds that the discovery process has revealed that it has no duty to indemnify defendant RDP under its policy. For the reasons given herein, the defendants' motions for summary judgment based on Minergy's failure to name an expert will be denied. Burlington's motion for summary judgment based on the exclusions contained in its policy will be addressed in a separate decision and order.

**I. Background**

Many of the facts giving rise to this action were set forth in this court's September 21, 2006 decision and order. For present purposes, the dispute involves a fire that broke out around 11:45 p.m. on the night of October 7, 2004 in a large industrial rotary dryer. The dryer itself was 12 feet wide and 85 feet long, and within it were a number of steam tubes and bays. The purpose of the dryer was to dry large quantities of sludge, a byproduct of the paper-making process, which was then able to be used for fuel. RDP had been hired to replace large steam tubes within the dryer (and RDP in turn hired QMI to help), but they faced problems due to a significant buildup of sludge within the dryer. The sludge hampered their efforts to replace the steam tubes as originally planned, and they eventually improvised a process that required them to scrape off large amounts of sludge from the tubes and then cut the tubes out using welding tools.

The sludge was of varying degrees of wetness, but much of it was flammable enough that QMI's employees working in the dryer spent a significant amount of effort watching for fires and putting them out with water buckets and fire extinguishers. These fires were typically small flare-ups and tended to begin when the arc of a welding torch came in contact with the sludge. These fires were all easily contained, however.

It is unknown how the large fire broke out around 11:45 p.m. on October 7, and it is disputed whether QMI employees were working at the time or whether they had left for lunch. But when the sludge caught fire it spread quickly and was reported to Minergy employees around 11:50. When they took control of the scene, they were unable to control it successfully. Eventually the fire department was called and the fire was controlled by the next morning. According to Minergy, the fire caused substantial damage.

Minergy sued QMI and its insurer for negligence, and it sued RDP and its insurer for breach of contract, although that claim is based on the allegation of negligence against QMI. Minergy also sued RDP for indemnification based on the terms and conditions of a purchase order.[1]

**II. Failure to Name an Expert Witness**

The defendants' motions for summary judgment assert that judgment should be granted in their favor because Minergy has failed to name any expert witnesses in support of its negligence claim. Expert testimony, the defendants note, can be crucial to aiding the factfinder when the alleged negligence involves the operation or workings of a complex machine or instrument. For instance, the Wisconsin Supreme Court has found expert testimony necessary when the claim of negligence involves the workings of a machine that may not be familiar to the average juror:

> Arguably, in the total absence of such expert testimony there may have been insufficient evidence as to the existence of negligence. The diesel and the generator involved in the case at bar are massive, complicated pieces of machinery which are not familiar to the average person. Whenever the question of negligence rests on facts or principles which would be extremely difficult for a conscientious juror to comprehend, the trial court may decline, upon motion, to permit the case to go to the jury in the absence of expert testimony on the negligence issue.

---

[1] In its briefing, Minergy does not distinguish between its contract and negligence claims against RDP, and it essentially concedes, in a footnote, that its indemnification claim fails because RDP never received the operative terms and conditions on which that claim is made. (Pl.'s Br. Opp. at 18 n.5.) While Minergy's indemnification claim against RDP will therefore be dismissed, its breach of contract claim survives. Wisconsin follows the rule that "accompanying every contract is a common-law duty to perform with care, skill, reasonable expediency and faithfulness the thing they agreed to be done, and a negligent failure to observe any of these conditions is a tort, as well as a breach of contract." *Colton v. Foulkes*, 259 Wis. 142, 146, 47 N.W.2d 901 (1951). Moreover, the delegation of the performance of a part of a contract by a general contractor to a subcontractor does not, unless the other party to the contract agrees, discharge the liability of the general contractor for any breach of contract. *Brooks v. Hayes*, 133 Wis.2d 228, 237, 395 N.W.2d 167, 170 (1986) ("[A] general contractor is liable to the owner for breach of the contractual duty of due care when an independent contractor negligently performs the general contractor's work under the contract . . . ."). Accordingly, it is apparent that Minergy's case rises or falls on its ability to prove QMI's negligence.

*City of Cedarburg Light and Water Commission v. Allis-Chalmers Mfg. Co.,* 33 Wis.2d 560, 567, 148 N.W.2d 13, 16 (Wis. 1967). In that case, a jury found that the defendant's failure to shop-test an engine was the cause of the accident. "The purpose of a shop test is to expose defects in the equipment. The jury may have believed that a shop test would have disclosed some of the flaws which subsequently developed." *Id.* at 565.

Rotary steam dryers are complex and unfamiliar to the public, the defendants argue, and expert testimony should therefore be required to explain the plaintiff's theory of negligence. It is true that, as in *City of Cedarburg,* a malfunction in a complex machine or some sort of injury resulting from its operation might require expert testimony. Even so, the danger here was presented not from any *operation* of the machine itself, but from the combination of sludge, fire and the close quarters involved in the job. Of course, the fact that it was a steam dryer is what explains the presence of paper sludge and the other factors involved in the fire, but those conditions are merely background information that could be explained without expert testimony. The fact that it was a rotary steam dryer is largely irrelevant to the negligence question – as the plaintiff notes, this is a case about a dangerous work area rather than a manufacturing defect, and the particular workings of the dryer are not necessary to determine whether the repairs performed on the dryer negligently caused the fire.

Even if no expert is required to explain working with steam dryers, the defendants also argue that an expert is needed to explain the proper standards of care governing welding or cutting work in such a situation. That is, the unusual nature of the welding work being performed in an enclosed and obviously flammable environment requires expert analysis of proper practices and procedures, including how many employees were watching for fires, where they were placed, what kind of fire

4

prevention techniques were used, and the like. Absent expert testimony, the jury would have no basis on which to conclude that the defendants' behavior failed to meet the requisite standard of care.

The plaintiff responds by explaining that its theory of the case is not so complicated. It will not attempt to show that any given employee was negligently performing welding work, or that QMI should have used more fire lookouts, or that it should have had more powerful firefighting equipment. In other words, Minergy's case is not going to implicate any safety practices or procedures particular to any specific industry. Instead, the plaintiff argues there is evidence that, for a period of time, the defendants left the work scene completely unmanned during a lunch break, and it was during this period that the fire broke out. The plaintiff believes that given the inherently dangerous nature of the work being performed, a jury could easily draw the "common sense" conclusion – without the aid of expert testimony – that leaving a dangerous work area unattended was dangerous. If the jury found that QMI had completely abandoned the scene of a sludge-laden enclosed tube where fires had been breaking out, it is not much of a jump to conclude that QMI was negligent. Thus, in the plaintiff's view this is a case of *res ipsa loquitur* – that is, that the defendants were acting so dangerously that their conduct speaks for itself.

While I agree with Minergy's argument that expert testimony is not required to prove negligence in this case, it is not for the precise reasons Minergy offers. Minergy's theory is that the jury may reasonably conclude that QMI was negligent based on evidence Minergy intends to offer that QMI employees left a dangerous work area unattended. The difficulty with this theory is that Minergy apparently has no admissible evidence that the work area was ever abandoned. Minergy relies solely on the recollection of two former Minergy employees who claim that, soon after the fire broke out, Robert Everett, a QMI employee who was working as the "hole watch" on the dryer,

5

entered the control room and casually said he had been to lunch and returned to find a fire started in the dryer. (Dkt. # 168, Ex. P; Gane Dep. at 45-46; Ex. Q, Thibodeau Dep. at 123-125.) Specifically, James Gane testified that Everett said that "they" or "we" had been out to lunch, and Gane assumed this meant the entire crew working on the dryer: "He didn't define we. So I would guess it was the crew that was working there." (Dkt. # 168, Ex. P; Gane Dep. at 46:23-25.) In Minergy's view, Everett's statement to the Minergy employees that he had returned from lunch suffices to create a genuine issue of material fact as to whether the work area had been abandoned or not.[2]

The defendants sharply dispute Minergy's conclusion. According to them, several QMI employees were on the scene at the time of the fire. First, Everett himself denies he ever said that he had been to lunch – in fact, according to him and the other QMI employees, no one except Ellis had left to take their typical 12:00 a.m. lunch break yet (recall that the fire occurred at about 11:45 p.m.). (Dkt. # 168, Ex. F; Everett Dep. at 105.) He further testified that when the fire broke out at least two but possibly three QMI people were still in the dryer in very close proximity. (*Id.* at 89.) He was a direct witness to the scene, and heard Bridgman yell "fire" as the QMI workers emerged from the dryer. (Id. at 91-92.) He testified that within "seconds" he then went into the dryer himself with a hose to try to put out the fire, but was unable to quell the fire because he could not see through the thick smoke.

According to Brian Bridgman, who was the fire watch in the fifth bay, Josh Ellis was cutting from the seventh bay and Eric Medford was his fire watch. Terry Nettles was cutting in the sixth bay with Brian Bridgman in the fifth bay as his fire watch. Robert Everett was working as the "hole

---

[2] The defendants note that the statement about returning from lunch did not make it into any contemporary accounts of the fire.

6

watch," on the lookout for fires. They were all cutting in the sixth bay, but from different sides, and they were all within about eight feet of each other. Ellis, cutting from the seventh bay, left for lunch at 11:40. QMI explains that his early departure was due to the fact that he had been cutting a bit ahead of Nettles and could not cut anymore until Nettles caught up. As such, there was no point for him to stay around given that the lunch break was fast approaching. His fire watch, Medford, remained in the bay. At 11:45, Bridgman told Nettles to "wrap it up" for lunch, and at that time Bridgman looked over to where Ellis had been working and saw flames shooting up. Thus, although Ellis had left at 11:40, the area was not "unattended" – the two fire watches were both there, as was Nettles, all within only a few feet of where the fire broke out. (Dkt. # 168, Ex. G.; Bridgman Dep. at 34-36.)

It is clear that Minergy's theory that QMI's employees left the work site is based only on the disputed hearsay testimony of two former Minergy employees, whereas the defendants' version is based on the testimony of several direct witnesses. As such, the disputed evidence merely goes to what Everett *said* upon reporting the fire to the control room. Plaintiffs' witness testimony about what Everett said five minutes after the fire broke out is hearsay because it is being offered for the truth of the matter asserted, i.e., that Everett and his crew were, in fact, out to lunch at the time of the fire. Fed, R. Evid. 801. Minergy does not suggest any applicable exception to the hearsay rule, and none is plausible.[3]

---

[3] I note that Wisconsin's state courts might treat this differently and deem a prior inconsistent statement not to be hearsay. Wis. Stat. § 908.01(4); *Schultz v. Scoles,* 1995 WL 71319, *2 (Wis. Ct. App.1995) ("the prior inconsistent statements are not hearsay and may therefore be used in summary judgment affidavits.")

7

It is conceivable that Minergy's evidence of what Everett said could be used not as independent substantive evidence, but as impeachment of his deposition testimony pursuant to Fed. R. Evid. 613(b). The Eighth Circuit explained the use of a prior inconsistent statement for such a purpose in *Firemen's Fund Ins. Co. v. Thien:*

> Both [witnesses'] statements are prior statements allegedly made by Thien which are inconsistent with his current testimony that Charles was on the plane to winterize the company car and clean the apartment. As prior inconsistent statements on a material issue of fact, these statements could have been considered by the court to raise doubts about Thien's statement in his deposition testimony. Thus, if Thien's evidence regarding the reason for Charles's presence on the plane was the only evidence on this issue of fact, putting this evidence in question through impeachment could defeat a motion for summary judgment when the moving party has the burden of persuasion.

8 F.3d 1307, 1312 (8th Cir. 1993). But "[w]hen hearsay testimony is admissible pursuant to Rule 613(b), that testimony may not be considered as substantive evidence." *Id.* at 1311. Thus, Minergy has no admissible evidence to support its theory that QMI's workers abandoned the site and thereby allowed the fire to get out of control.

A second problem with Minergy's reliance on the hearsay testimony is that it does not actually contradict the sworn testimony of QMI employees who were actually working in the dryer at the time. According to Minergy's brief, Minergy's employees heard Everett state that "he and his crew had been at lunch." (Pl.'s Br. at 12.) This is a misrepresentation of the record. James Gane, the only Minergy employee with a specific recollection of Everett's statement, merely testified that Everett said "they had been at lunch" and that Everett had found a fire when he returned. (Dkt. # 168, Ex. P; Gane Dep. at 45-46.) As noted earlier, Gane's belief that "they" or "we" meant the entire QMI welding team was purely speculative. As such, even if the hearsay testimony were considered as substantive evidence, it does not suffice to create a genuine issue of fact in the face of the defendants' direct evidence to the contrary.

8

In sum, Everett's alleged statement regarding being at lunch when the fire broke out is hearsay and may not be used as substantive evidence. Even accepting Minergy's witnesses' testimony for the truth of the matter asserted, however, the vague statement that "they" or "we" were at lunch is not enough to contradict Bridgman's clear testimony that he, Nettles and Medford were all in the dryer when the fire broke out. Minergy has thus failed to provide admissible evidence that the dryer was left unattended at any time. The stray utterance attributed to Everett is simply too thin a reed on which to hang Minergy's claim that the dryer was abandoned.

But that does not mean the defendants are entitled to summary judgment. In deciding a motion for summary judgment, the court must "construe all facts and reasonable inferences in favor of the nonmoving party." *Tubergen v. St. Vincent Hosp. and Health Care Center, Inc.*, 517 F.3d 470, 473 (7th Cir. 2008). Here, the evidence, viewed in the light most favorable to Minergy, is that sometime on October 4, 2004, QMI's employees began using oxygen acetylene torches and air arch gougers to cut and remove the old tubes from the dryer. (Def.'s PFOF ¶¶ 42, 55.) QMI employees were aware that occasionally, "[t]he sludge would set and smolder for a while and, once it dried, it would ignite (flame-up and start a fire) because it is paper even though it is usually slower combusting." (Def.'s PFOF ¶ 68.) To guard against fires, QMI "set up a fire watch whereby each cutter had a person watching them as they cut tubes inside the dryer to ensure no major fire started." (Def.'s PFOF ¶ 88.) QMI began cutting the tubes out in smaller pieces on the afternoon of October 5. Throughout the rest of that day, the next and most of the next, QMI's crews were cutting and removing the old tubes. There were occasionally small flare-ups that the fire watch persons were able to easily extinguish by dousing them with a small amount of water. (Def.'s PFOF ¶¶ 77-80, 92.) At approximately 11:45 p.m. on October 7, Ellis noticed flames shooting up the side of the dryer shell from between the tubes. (Def.'s ¶ 110.) Bridgman and others tried to extinguish the fire

9

but were unable to do so. When the smoke became too thick and they were unable to see, they abandoned their efforts and turned the fire suppression efforts over to Minergy. (Def.'s PFOF ¶¶ 118-120.) Before the fire could be extinguished, it caused substantial damage.

These facts are sufficient to permit a jury to infer that QMI's employees were negligent in the performance of their duties and that such negligence allowed the fire to get out of control, whether they left the site or not. QMI's employees were certainly aware of the danger of fire and had no difficulty in extinguishing the small flare-ups that occurred over the previous three days. By their own account, they were able to easily extinguish these flame-ups by dousing them with a small amount of water. In their reply briefs, the defendants suggest reasons explaining why the fire may have been more severe and thus not controllable, but that does not mean a jury could not reach another conclusion.[4] While QMI's employees may claim they were watching just as closely as they were over the previous three days, a jury would not be bound by their testimony in the face of this evidence. Even if they were still on the site, it does not conclusively follow that they were watching closely for fire. A jury could infer from the fact that on this occasion the fire got out of control that they failed to use due care in maintaining careful watch over the site. Such failure, if found by a jury, would amount to negligence.

This is not an application of the doctrine of *res ipsa loquitur* ("the thing speaks for itself"). *Res ipsa* requires proof that the event in question would not occur in the absence of negligence, and that the instrumentality causing the harm was within the exclusive control of the defendant. *See Lambrecht v. Estate of Kaczmarczyk,* 2001 WI 25, ¶ 3, 241 Wis.2d 804, 820, 623 N.W.2d 751, 761 (Wis. 2001). In short, *res ipsa* allows a jury to make an inference of negligence even absent specific

---

[4] The motion to strike the facts and arguments raised for the first time will be denied. As noted, I have considered the arguments but have not found them dispositive.

evidence of negligence. To make this inference absent other evidence, however, the event in question must "speak for itself" – that is, it must be the sort of thing that only occurs as a result of negligence.

Here, there is insufficient evidence to determine whether *res ipsa* applies. Sometimes, of course, fires start even with the exercise of due care. *Arledge v. Scherer,* 269 Wis.2d 142, 150, 68 N.W.2d 821, 826 (1955) ("Fires frequently occur without negligence."). Whether a fire could have gotten out of control under the circumstances presented here even if the watchers were properly performing their jobs and all other pertinent safety precautions are taken is not clear from the record before me. Thus, I cannot say at this point whether the *res ipsa loquitur* doctrine applies. But there is no need to rely on *res ipsa* because the evidence that is available is sufficient to permit a jury to infer the negligence of the workers. The fact that for three days the workers had no difficulty extinguishing the fires caused by their torches permits the inference that just prior to the fire that severely damaged Minergy's property they were not using the same degree of care.

In sum, I conclude from the record as it now stands that the plaintiff need not offer the testimony of an expert witness to establish negligence on the part of the QMI workers. The defendants' motions for summary judgment, [158] and [163], are therefore **DENIED**, except that plaintiff's claim against RDP for indemnification is dismissed. The motion to strike [205] is **DENIED**.

**SO ORDERED** this \_\_\_\_7th\_\_\_\_ day of April, 2008.

          s/ William C. Griesbach
          William C. Griesbach
          United States District Judge