UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

MINERGY NEENAH, LLC,

      Plaintiff,

v.                                        Case No. 05-C-1181

ROTARY DRYER PARTS, INC., et al.,

      Defendants.

**DECISION AND ORDER**

Before me presently is the second summary judgment motion on coverage issues filed by defendant Burlington Insurance Company. Burlington asserts that the applicable insurance policies do not cover the damages alleged in this case and that it has no duty to indemnify, and thus no duty to continue providing a defense to defendant Rotary Dryer Parts, Inc. Although Burlington's argument in support of its motion is stronger this time around, I nevertheless conclude that the result should be the same. Accordingly, the motion will be denied.

**I. Background**

This court recently denied the defendants' motion for summary judgment on the merits of the underlying claim, and in that decision many of the operative facts are set forth. (Dkt. # 224.) An earlier decision set forth the operative insurance polices. (Dkt. # 102.) For present purposes, it is enough to explain that the dispute arises out of a fire that broke out on October 7, 2004, while defendant Quality Mechanical, Inc., a subcontractor of defendant Rotary Dryer Parts, Inc. ("RDP"),

was working on replacing the steam tubes within Minergy's rotary dryer.[1] The fire broke out in the sludge and caused substantial damage to the interior of the dryer and rendered it unusable for roughly a month. The fire also caused structural damage to the dryer shell (the exterior).

**II. Analysis**

The present coverage dispute involves the scope of work for which RDP was hired. In an earlier motion for summary judgment, Burlington argued that its policy's j(6) exclusion applied, but I denied that motion based on the understanding that the insured's scope of work was limited to the steam tubes inside the dryer rather than the dryer as a whole. Because the plaintiff was seeking damages for damage caused to property *outside* the defendants' scope of work (e.g., the dryer shell), I concluded the j(6) "business risk" exclusion did not apply.

Burlington does not dispute that conclusion, but argues that additional facts that have been adduced in discovery now establish that the scope of the work RDP was hired to perform covered the entire dryer and not just the tubes on the interior. Based on these additional facts, which it contends are undisputed, Burlington contends that it is clear as a matter of law that both exclusion j(6) and exclusion j(5), which is similar, apply and that none of the damages claimed in the lawsuit are covered by its policy. Since none of the damages are covered, Burlington claims it has no duty to indemnify RDP and its motion for summary judgment should be granted. Because one of the policy exclusions on which Burlington relies for the present motion is the same one addressed previously, it is worth reiterating the basis of my earlier decision at some length.

---

[1] For the purposes of this lawsuit, Rotary Dryer Parts, Inc. is considered a successor to the Charles Brown Company, the original contractor hired by Minergy. I refer to the company herein simply as RDP.

2

Exclusion j(6) – common in CGL policies like the one at issue here – excludes coverage for "property damage" to "that particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it." In the original coverage decision, I rejected application of the j(6) exclusion on the following grounds:

> here the insured was *only working on the steam tubes* within the interior of a very large industrial apparatus. It was *hired to replace steam tubes*, and does not now seek coverage for any damage to its own work. Instead, the coverage claim is limited to the damage to other parts of the dryer that resulted from a fire that was allegedly caused by the insured's work. The fact that damage may have been caused to parts of a large integrated unit is merely happenstance; other sections of the dryer were simply not the "particular part" of the property at issue, and so by its own terms the exclusion does not apply.

(Dkt. # 102 at 6.) (italics added).

The italicized portions of the decision indicate that I deemed the j(6) exclusion inapplicable because RDP was hired only to work on the steam tubes, and that was deemed the "particular part" of the property on which it was working: "Here, the particular part the defendant worked on were the steam tubes within the dryer rather than the dryer as a whole." (*Id.* at 8.) Because the plaintiff sought damages for parts of the dryer *apart* from the steam tubes, I found that the exclusion did not bar coverage or remove Burlington's duty to defend.

Burlington now says that the premise of my earlier decision on summary judgment has been proved false through discovery. Specifically, Burlington has obtained the work order submitted by RDP's predecessor, the Charles Brown Company. Under the heading "Job Description," the work order lists twelve aspects of the proposal. (Burlington PFOF, ¶ 4.) Although removal and replacement of the steam tubes was the principal focus of the job, the proposal also states that RDP would "[e]xamine the shell for cracking and repair any cracks found." (*Id.*) Based on this work

3

order, Burlington believes it is now beyond doubt that RDP was hired not just to fix the steam tubes but to work on the entire dryer. Accordingly, the steam tubes were not "that particular part" of property that limited the exclusion's applicability–the *entire* dryer was within the scope of the business risk that RDP assumed when it took on the job.

Burlington also claims that coverage is excluded by a closely related exclusion, j(5), which applies to "property damage to . . . [t]hat particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the 'property damage' arises out of those operations." This exclusion applies, according to Burlington, because the dryer is a fixture and thus would be considered real property under Illinois law.[2] *See Nokomis Quarry Co. v. Dietl*, 775 N.E.2d 669, 673 (Ill. App. 2002) (" In Illinois, a fixture is real property that is incorporated into or attached to realty."). Because either or both exclusions remove coverage for the property damage claimed in the underlying suit, Burlington contends that its motion for summary judgment should be granted.

In my earlier decision on this question, one of the cases addressed was *Pekin Ins. Co. v. Willett,* 704 N.E.2d 923, 924 (Ill. Ct. App. 1998), whose central facts were as follows:

> Willett entered into a contract with Simmons to service, paint, clean, and prepare for summer use the in-ground swimming pool at Simmons's home. The agreement provided that Willett was to empty the pool, paint it, and fill it with water and the requisite chemicals so that it was ready for use. After Willett painted the pool and before he filled the pool with water, a heavy rainstorm caused the pool to push up out of the ground.

The *Willett* court found the exclusion applicable because Willett had been hired to repair the entire pool, and the entire pool is what was damaged and the damage was caused by his faulty

---

[2] As noted in the earlier coverage decision, the parties agree that Illinois law applies.

4

Case 2:05-cv-01181-WCG   Filed 04/24/08   Page 4 of 13   Document 227

workmanship. I found *Willett* distinguishable, however, because in this case RDP was hired only to replace the steam tubes, *not* the entire rotary dryer. Burlington's position is that because we now know that at least part of RDP's work order did encompass working on the entire dryer (including the dryer's shell), *Willett* has more applicability than it did in my previous ruling.

In further support of its position, Burlington cites another Illinois appellate court case, *Pekin Insurance Co. v. Miller*, 854 N.E.2d 693 (Ill. App. 2006), that addressed the related j(5) exclusion. In *Miller*, the issue was whether a CGL policy provided coverage when the insured contractor mistakenly cut down trees from the wrong property. The court concluded that both exclusions j(5) and j(6) were ambiguous. The court found exclusion 2j(5) ambiguous "because it is not clear whether the exclusion refers to any property [on which the insured worked] or only to property that the insured is contractually obligated to perform operations on." 854 N.E.2d at 700. Given the purpose of CGL policies, the court concluded that one could reasonably interpret exclusion 2j(5) to apply only to property on which the insured is contractually obligated to work. Under that construction, the exclusion did not apply since the property damage occurred to property on which the insured was not contractually obligated to work. Based on the principle that exclusions are to be narrowly construed against the insurer and in favor of coverage, the court concluded that the exclusion was limited to damage to property on which the insured was contractually obligated to work. *Id.* at 700-01. Burlington argues that *Miller* supports its argument that the "scope of the exclusion [is] dictated by the reach of the contractual scope of work . . . ." (Burlington Br. in Reply at 8.)

I find neither *Willet* nor *Miller* dispositive of the issue here. Even with new evidence concerning the scope of the work RDP agreed to perform, *Willett* remains distinguishable because

5

in that case the contractor had already begun working on the entire pool. The damage was caused after he drained it and failed to fill it before a storm struck. As such, it is reasonable to view the damage caused to every part of the pool as damage resulting from Willett's workmanship: in the exclusion's terms, the damage was caused to "that particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it." In short, Willett was working on the whole pool and the whole pool was what suffered damage; in a case like that, it makes sense to take a broader reading of the term "particular part" and view the entire pool as such.

Here, however, the damage to the dryer shell remains separate and distinct from the scope of the work being performed at the time the fire broke out. It is true that the work order provided that inspecting the shell was to be a part of the overall job, but that work had either not yet begun or was simply not part of the picture. Arguably, RDP assumed the business risk related to damages stemming from its own *work* on the dryer shell, but the mere fact that work on the shell was part of the overall work order does not mean RDP assumed the business risk stemming from *collateral* damage to the shell as a result of the separate and distinct work it had agreed to perform on the steam tubes. Ultimately, it is pure chance that RDP's work order happened to encompass part of the property that got damaged.

On this point I find persuasive the decision of the Missouri Supreme Court in *Columbia Mutual Ins. Co. v. Schauf*:

> Schauf agreed to paint, stain, or lacquer all interior and exterior surfaces of the Sodaros' house. On October 26, 1994, Schauf was spraying lacquer onto kitchen cabinets while his employees were spraying doors in a bedroom. After Schauf completed applying the lacquer to the kitchen cabinets, he began cleaning his spray equipment inside the house before he was to go home for the day. As Schauf started

6

his pump generator to pump lacquer thinner through the lines of his sprayer, the pump generator started a fire, which caused extensive damage throughout the house and required the replacement of sheetrock, insulation, subflooring, molding, windows, a sliding door, and textured ceilings.

*Columbia Mut. Ins. Co. v. Schauf,* 967 S.W.2d 74, 76 (Mo. 1998).

Considering the applicability of the j(5) exclusion (similar to the j(6) exclusion), the court was forced to construe the meaning of the term "particular part." In doing so, the court saw two options. First, the insurer argued that the "particular part" should be governed by what the painter had contracted to do. "Under this interpretation, any damage the insured causes to property in the area in which he was contracted to work would be excluded from coverage." *Id.* at 80. The second option would be to tie the "particular part" language to the particular area where the insured was working at the time the damage was caused. "Under this interpretation, only the damage the insured causes to the particular part of the property that is actually the object of the insured's work when the damage occurs is excluded from coverage; any other damage would not be subject to the exclusion. *Id.* The *Schauf* court preferred the former interpretation, finding that even though Schauf's contract required him to work on the entire house, the exclusion precluded coverage only for the kitchen cabinets – the area he was working on at the time the fire started.

The Missouri court's interpretation of the "particular part" language is persuasive here because it affords the term a meaning that comports with its business risk purpose. In *Acuity v. Burd & Smith Const., Inc.*, the North Dakota Supreme Court discussed both the j(5) and j(6) business risk exclusions, explaining:

> The principle behind such exclusions is based on the distinction made between two kinds of risk incurred by a contractor. . . . The first is the business risk borne by the contractor to replace or repair defective work to make the building project conform to the agreed contractual requirements. This type of risk is not covered by the CGL

7

> policy, and the "business risk" exclusions in the policy make this clear. The second is the risk that the defective or faulty workmanship will cause injury to people or damage to other property. Because of the potentially limitless liability associated with this risk, it is the type for which CGL coverage is contemplated.

721 N.W.2d 33, 37-38 (N.D. 2006) (citations omitted). Here, regardless of what the original work order may have envisioned, coverage for the dryer shell is not being sought for replacement and repair of defective work–it is for (allegedly) faulty workmanship that caused damage to "other property." *Id.* at 38 ("A CGL policy does not insure the insured's work itself; rather, it insures consequential damages that stem from that work.")

As noted earlier, if the damage resulted from the contractor's work on the outside of the shell, presumably that would be a business risk not covered by the policy. But here the damage was caused to part of the dryer that was unrelated to any work going on within. It is only by chance that inspecting cracks in the dryer shell was part of the original work order in this case. To the extent RDP assumed any business risks related to the dryer shell, it did not assume a risk that the dryer shell would be damaged in a fire resulting from work on an entirely different part of the project.

This is not to ignore the holding in *Miller*. No doubt a work contract is evidence of the kinds of work a given party agrees to perform, and no doubt the contract will in many ways govern the sorts of business risks the party agrees to assume. In some cases, the existence of a work order may be conclusive as to what was *not* within the insured's business risk. *See Miller*, 854 N.E.2d 701 (contractor hired to cut down trees on particular property did not assume risk of cutting down neighbor's trees); *Acuity,* 721 N.W.2d at 42 (contractor hired *only* to replace roof did not assume risk of damage to entire apartment building). But that is not what Burlington offers the work order for here. It offers the work order not as the outer limit of the exclusion, but as the only limit. In

8

other words, Burlington contends that the policy excludes coverage for damage to property on which the insured is contractually obligated to work at some time in the future, even though it has yet to undertake such work. But that is not what the exclusion says. It excludes damage to "[t]hat particular part" of the property, real or personal, on which the insured was then performing operations or incorrectly performed his work. To interpolate the work order into the exclusion as Burlington suggests would violate the principle that exclusions are to be narrowly construed against the insurer. Burlington has not cited any authority holding that a work order like the one at issue here automatically means the insured has assumed any and all risks of loss to any property within the scope of work–especially when that work has not even been undertaken.

Ultimately, the difficulty lies with the use of the phrase "that particular part" to delimit the scope of both exclusions. The phrase lacks the precision required for clear and certain application. It could be read so narrowly as to have almost no effect at all. In *Vinsant Elec. Contractors v. Aetna Cas. & Sur. Co.*, 530 S.W.2d 76 (Tenn. 1975), for example, the court refused to construe a similar provision containing the same phrase "so as to limit the exclusion to the precise and isolated spot upon which work was being done." *Id.* at 78. "Such a construction would lead to illogical and absurd results and would completely nullify the intent of the endorsement. An exclusion so limited could well result in being, in practical effect, no exclusion at all." *Id.* at 77. Thus, in *Vinsant*, the court held that a switchboard, described as a single integrated unit, was "that particular part" of the property upon which the operations were being performed when the insured electrical contractor, hired to install two circuit breakers, caused the entire board to burn and blow up when he allowed a wrench to come into contact with two 'buss' bars producing phase to phase contact. *Id.*

On the other hand, the *Vinsant* Court noted that the result would be different under the facts of a similar case in which it had found no coverage under the "care, custody or control" exclusion

9

that was previously part of the CGL policy. In *Hill v. United States Fidelity and Guaranty*, 348 S.W.2d 512 (Tenn. App. 1961), the insured was hired to rewire the electrical motors that powered a series of printing presses and were connected thereto by belts. The insured attempted to loosen a belt in order to guard against inadvertent activation of the presses but did not loosen it enough. When the motors were started, one of the presses was damaged. Although the court of appeals had held in *Hill* that coverage had been properly denied because the press was under the care, custody or control of the insured, the *Vinsant* Court noted that "had the insured in *Hill* been covered by a 'Broad Form' exclusion, he would have prevailed since the motors were 'that particular part' of the property upon which operations were being performed." *Vinsant*, 530 S.W.2d at 78.

*Hill* is more like this case than *Willet* or *Vinsant*. Just as the motors that ran the printing presses in *Hill* were "that particular part" of the property upon which the operations were being performed there, the steam tubes inside the shell of the dryer constitute "that particular part" of the property upon which the operations were being performed here. Unlike *Willet*, where the insured was in the process of performing operations on the entire swimming pool, RDP was still working only on removing the steam coils when the fire broke out. Thus, both exclusions j(5) and j(6) apply only to damage to the tubes and not the shell.

The case is also unlike *Jet Line Services, Inc. v. American Employers Insurance Co.*, 537 N.E.2d 107 (Mass. 1989), a case heavily relied on by *Willet* and which Burlington also cites. In *Jet Line*, the insured was hired to clean and repair a large petroleum tank. While the insured's employees were working on the bottom of the tank, it exploded. The tank owners sued Jet Line for damage to the tank, but its insurer denied coverage based on a provision that excluded "coverage for damage 'to that particular part of any property . . . upon which operations are being performed' by the insured 'at the time of the property damage arising out of such operations.'" *Jet Line*, 537

10

N.E.2d at 111. The Massachusetts supreme court agreed, holding that "the words 'that particular part of any property . . . on which operations are being performed' refers to the entire tank and not just to the bottom of the tank that Jet Line personnel were cleaning at the moment of the explosion. Jet Line was retained to clean the entire tank, and it was the entire tank on which operations were being performed within the meaning of the policy language." *Id; see also Southwest Tank & Treater Manuf. Co. v. Mid-Continent Cas. Co.*, 243 F. Supp. 2d 597, 604 (E.D. Tex. 2003) ("[T]he majority of other jurisdictions that have interpreted this phrase have held that '[t]hat particular part' includes the entire piece of property on which the insured was working at the time of the accident.").

A tank, however, like a swimming pool, is a unified structure and is not comprised of separate parts. One can refer to the top or bottom of a tank, but those are simply different areas of the property, as opposed to separate parts. To construe the phrase "that particular part" to mean the isolated spot on the property upon which the work was being performed at the specific time the damage occurred would lead to the absurd results referred to in *Vinsant*. So limited, the exclusion would have no effect at all. On the other hand, where as here, the property upon which the work is performed has separate components, i.e., internal steam coils and an outer shell, it is reasonable to conclude that an exclusion that removes coverage for property damage only to "that particular part" of the property on which the insured is performing operations, does not exclude coverage for the part on which the insured has not yet begun to work. No other interpretation gives meaning to the specific language of the exclusion. If Burlington wants to exclude coverage for property damage to the entirety of the property on which its insured performs work, instead of "that particular part" of the property on which work is performed, it should say so. But the court may not by judicial construction do the job for it. I thus conclude that even with the contract now in evidence, the

11

damage caused to the dryer shell is more like the typical collateral damage covered by a CGL policy than a business risk to be borne by the insured. Accordingly, Burlington's motion for summary judgment on its duty to defend and indemnify will be denied.

Burlington raises the additional argument that it has no duty to defend or indemnify RDP in this case because RDP has no rights under the applicable policy. As noted above, the Charles Brown Company ("CBC") was the original name of the company hired by Minergy to refurbish its rotary dryer. CBC sold some of its assets to another company and subsequently changed its name to Rotary Dryer *Design*, Inc., which is not a defendant here. Rotary Dryer Design, Inc. retained all of the assets of CBC that were not sold off. Essentially, Burlington alleges, Rotary Dryer Parts, Inc., the defendant here, is a wholly independent entity that never stepped into the shoes of CBC with respect to the Burlington insurance policy. As such, it has no relationship with Burlington and Burlington need not continue defending it.

Minergy and RDP argue that Burlington has waived this argument by presenting it only now, in what is essentially its third motion for summary judgment. But a defendant does not waive, or more precisely, stipulate to an essential element of the plaintiff's claim by failing to raise it earlier. More importantly, however, it appears that if any defect in parties exists, it would more properly be handled by amending the pleadings. Minergy is suing the successor company to CBC–the company it originally hired. Practically speaking, Minergy does not care whether that company is called Rotary Dryer Parts or Rotary Dryer Design. Both companies are run by the same person, Charles W. Brown, and obviously RDP and its counsel have been defending this action for more than two years as though RDP were the actual successor in interest to CBC. If it proves Rotary Dryer *Parts,* Inc. is not the proper party, there is no perceptible reason Minergy would not be

12

allowed to amend its complaint to name Rotary Dryer *Design*, Inc. At this stage, any amendment would be largely cosmetic. The point is that CBC was apparently paying the premiums on the Burlington policy at the time the fire occurred, and if Rotary Dryer *Design*, Inc. is the actual entity that assumed CBC's rights under the policy, Burlington cannot somehow escape its contractual duties by dint of some corporate reshuffling on the part of CBC.

In sum, the argument Burlington offers seems not so much a substantive one dispositive of the claims as it is technical over the form of the pleadings. Nevertheless, the issue should be resolved. Minergy and RDP should verify that the proper insured party has been named. If CBC's rights under the policy of insurance issued by Burlington remain with CBC or inure to some other corporate entity, an amendment of the pleadings may be necessary. Minergy should seek leave to amend or explain with RDP why no amendment is needed within the next twenty days. Burlington may file a response to their filings within twenty days thereafter if the issue is still in dispute, and I will enter a decision thereafter. At this time, however, I decline to award Burlington summary judgment on the ground that Minergy has failed to properly name its insured.

For the reasons given above, the motion for summary judgment is **DENIED**. The clerk is directed to set this matter on the court's calendar for a Rule 16 telephone conference for further scheduling.

Dated this   24th   day of April, 2008.

                                                     s/ William C. Griesbach
                                                    William C. Griesbach
                                                    United States District Judge